IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

**HUNTINGTON DIVISION**

REX EAGON and DIANA EAGON,
individually and as co-administrators of the
ESTATE OF DARIEN M. EAGON,

                Plaintiffs,

v.                                    CIVIL ACTION NO.  3:23-0013

CABELL COUNTY EMERGENCY MEDICAL SERVICES,
UNIDENTIFIED CABELL COUNTY EMERGENCY MEDICAL SERVICES AGENT,
GORDON MERRY III,
HUNTINGTON POLICE DEPARTMENT,
OFFICER J. SMITH,
OFFICER D. ANDERSON,
OFFICER M. CREMEANS,
CAPTAIN MERRITT,
CABELL COUNTY SHERIFF'S DEPARTMENT,
CABELL COUNTY COMMISSION,
SHERIFF CHARLES "CHUCK" N. ZERKLE, JR. and
JOHN DOE NON-PARTY FAULT ENTITY IDENTIFIED BY CO-DEFENDANTS,

                Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court are two Motions to Dismiss filed by the various Defendants. Plaintiffs Rex and Diana Eagon, individually and as co-administrators of the Estate of Darien M. Eagon, oppose the motions, in part. For the following reasons, the Court **DENIES**, **in part**, and **GRANTS**, **in part**, Defendants' motions.

**I.**
**BACKGROUND**

On January 9, 2023, Plaintiffs filed this action against the Cabell County Emergency Medical Services (EMS); an Unidentified EMS Agent; Gordon Merry III, the Director

of EMS; the Huntington Police Department (HPD); HPD Officers J. Smith, D. Anderson, M. Cremeans; HPD Captain Merritt; the Cabell County Sheriff's Department; the Cabell County Sheriff Charles "Chuck" N. Zerkle, Jr.; the Cabell County Commission; and John Doe Non-Party Fault Entity Identified by Co-Defendants. In their Complaint, Plaintiffs allege that, on Sunday, January 10, 2021, their daughter Darien Eagon was drinking alcohol and repeatedly expressing thoughts of suicide to her live-in boyfriend. *Compl*. ¶17. In response, the boyfriend called Ms. Eagon's parents and Cabell County 911. *Id*. ¶¶18, 19. Plaintiffs, EMS, and HPD came to the residence. *Id*. ¶20.

The boyfriend told the EMS personnel and the HPD officers that Ms. Eagon needed help. *Id.* ¶24. However, instead of helping Ms. Eagon, Plaintiffs claim the body camera footage from an HPD officer reveals that the EMS personnel said that neither EMS nor HPD could do anything because Ms. Eagon was alert. *Id*. ¶22. According to Plaintiffs, the EMS personnel also stated that, although the Sheriff's Department is supposed to handle these situations, it "would not come out because they do not do mental hygiene orders on Sundays." *Id.* ¶21. Plaintiffs further allege both the EMS personnel and the HPD officers said that, even aside from Sundays, the Sheriff Department's response is lackluster. *Id.* ¶25. Plaintiffs claim they were told this situation "was not an isolated occurrence as the Huntington Police Department and EMS personnel noted 'the last one was really bad' and St. Mary's wouldn't take him." *Id*. ¶23.

Defendants assert Plaintiffs' factual summary of the body camera footage is inaccurate, misleading, and incomplete. They point out the footage reveals that, when the HPD officers arrived on the scene, they were informed by EMS that Ms. Eagon was "alert and oriented,"

"doesn't want anyone to bother her," and "she won't go." *Body Camera Video Footage*, Ex. 3 to *The City Defs.' Mot. to Dismiss*, at 1:28, ECF No. 15-3.[1] Rex Eagon also indicates on the footage that Ms. Eagon was unwilling to leave with him or her mother. *Id.* at 5:32.

Eventually, EMS, HPD, and Ms. Eagon's parents left the scene. Later that day, Ms. Eagon's boyfriend also left the residence because "Ms. Eagon was being abusive toward him." *Id.* ¶28 (internal citations omitted). When the boyfriend returned that night with a friend, he found Ms. Eagon had hung herself and tragically died. *Id.* ¶¶30, 31.

Plaintiffs allege at the time of Ms. Eagon's death, "the Cabell County Sheriff's Department apparently had a custom, practice and policy of not properly responding to emergency mental hygiene and potential suicide calls or cases." *Id.* ¶16. Plaintiffs claim that the Sheriff's Department's custom, practice, and policy "was well known to the putative co-Defendants and apparently caused the Huntington Police Department and Cabell County EMS to tell the parents that there was nothing that could be done on a Sunday to help their suicidal daughter." *Id.* In fact, Plaintiffs assert that, shortly after Ms. Eagon died, West Virginia Public Radio aired a story in which it reported that "data from a mental health facility show at least 75 mental hygiene orders

---

[1] Plaintiffs assert that Ms. Eagon's refusal to receive care is beyond the scope of the Complaint. However, the Complaint specifically references and relies upon the body camera footage taken at the scene. Therefore, the Court may consider that footage without converting the motion to dismiss into one for summary judgment. *Johnson v. James B. Nutter & Co.*, 438 F. Supp. 3d 697, 704 (S.D. W. Va. 2020) (stating "courts may consider documents outside the complaint in limited circumstances without converting a motion to dismiss into one for summary judgment. Importantly, this includes documents submitted by the movant that [were] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity" (internal quotation marks and citations omitted)).

went unanswered by the Cabell County Sheriff's Department in 2020. The sheriff [said] his department is overwhelmed." *Id*. ¶13.[2]

In their Complaint, Plaintiffs allege six causes of action against Defendants. Count I is for a violation of 42 U.S.C. § 1983. Count II is for a violation of Article 3, § 10 of the West Virginia Constitution. Count III is for ordinariy and/or professional negligence. Count IV is for outrage and reckless infliction of emotional distress. Count V is for a violation of West Virginia Human Rights Act. Finally, Count VI asserts a violation of the Americans with Disabilities Act. As problematic throughout all the Counts in the Complaint, Plaintiffs refer to "Defendants" collectively and do not identify what Count applies to which Defendant(s). It seems apparent that some of the claims do not apply to some Defendants, but Plaintiffs have made no attempt to differentiate amongst them in the Counts of the Complaint.

In their motions, Defendants raise a sundry of reasons why this action and/or various claims should be dismissed against them. Defendants HPD, Captain Merritt, and the individually named HPD officers (sometimes collectively referred to as the "City Defendants") filed a Motion to Dismiss (ECF No. 15) and Defendants Cabell County Commission, EMS, EMS Director Merry, the Sheriff's Department, and Sheriff Zerkle (sometimes collectively referred to as the "County Defendants")[3] filed a separate Motion to Dismiss. ECF No. 26. Plaintiffs oppose

---

[2]Interview available at: West Virginia Public Broadcasting, Cabell Sheriff Says System Broken As 20 Percent Of Mental Safety Pickups Go Unanswered In County (Apr. 5, 2021) https://perma.cc/4EPP-E4TC.

[3]The County Defendants' motion was not filed on behalf of the "Unidentified Cabell County Emergency Medical Services Agent." Thus, the action remains against this unidentified

some of Defendants' arguments, but they also now state they do not intend to pursue some of their causes of actions against some Defendants. With this backdrop, the Court turns to Defendants' motions.

## II.
## STANDARD OF REVIEW

In evaluating a motion to dismiss, the Court looks for plausibility in the complaint. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard requires a plaintiff to set forth the "grounds" for an "entitle[ment] to relief" that is more than mere "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (internal quotation marks and citations omitted). Accepting the factual allegations in the complaint as true (even when doubtful), the allegations "must be enough to raise a right to relief above the speculative level." *Id*. (citations omitted). If the allegations in the complaint, assuming their truth, do "not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court." *Id*. at 558 (internal quotation marks and citations omitted).

In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court explained the requirements of Rule 8 and the "plausibility standard" in more detail. In *Iqbal*, the Supreme Court reiterated that Rule 8 does not demand "detailed factual allegations[.]" 556 U.S. at 678 (internal quotation marks and citations omitted). However, a mere "unadorned, the-defendant-unlawfully-harmed-me accusation" is insufficient. *Id*. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

---

Defendant. Likewise, the action remains against "John Doe Non-Party Fault Entity Identified by Co-Defendants."

face.'" *Id*. (quoting *Twombly*, 550 U.S. at 570). Facial plausibility exists when a claim contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citation omitted). The Supreme Court continued by explaining that, although factual allegations in a complaint must be accepted as true for purposes of a motion to dismiss, this tenet does not apply to legal conclusions. *Id*. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. (citation omitted). Whether a plausible claim is stated in a complaint requires a court to conduct a context-specific analysis, drawing upon the court's own judicial experience and common sense. *Id*. at 679. If the court finds from its analysis that "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief.'" *Id*. (quoting, in part, Fed. R. Civ. P. 8(a)(2)). The Supreme Court further articulated that "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id*.

## III.
## DISCUSSION

### A.
### HPD and the Sheriff's Department
### are Improperly Named Defendants

In the City Defendants' motion, HPD first argues it is improperly named as a Defendant because it is not a legal entity that can be sued. *Weigle v. Pifer*, 139 F. Supp. 3d 760, 765 n.1 (S.D. W. Va. 2015) (dismissing the city police department because it "is not a separate suable entity"). In their Amended Response, Plaintiffs concede that they should have named the City of Huntington and not HPD as a defendant. *Pls.' Am. Resp. to the City Defs.' Mot. to Dismiss*,

at 3, ECF No. 24. Plaintiffs further state they "do not oppose substituting the 'City of Huntington' in for the 'Huntington Police Department' as the name of that Defendant." *Id*. Ordinarily, a party must file a motion to substitute one party for another. Although Plaintiffs have not done so in this matter and are cautioned to do so in future cases, the Court, in this instance, **ORDERS** the "City of Huntington" be substituted for HPD to prevent further delay on ruling on the Motions to Dismiss.

The Court also observes that Plaintiffs have sued the Cabell County Commission and the Cabell County Sheriff's Department. However, like HPD, the Sheriff's Department is not a separate suable entity as suit lies with the County Commission. *See Zsigray v. Cty. Comm'n of Lewis Cty.*, No. 2:16-CV-64, 2017 WL 462011, at *2 (N.D. W. Va. Feb. 2, 2017), aff'd sub nom. *Zsigray v. Cty. Comm'n of Lewis Cty., W. Va.*, 709 F. App'x 178 (4th Cir. 2018) (holding "while West Virginia law authorizes suits against a county commission/council, it does not contain any similar provision for county sheriff's offices. Therefore, while plaintiff may sue the County Commission of Lewis County, he may not sue the Lewis County Sheriff's Office" (citation omitted)). While the County Defendants have not argued that the Sheriff's Department should be dismissed for this reason, it clearly is an improperly named party. Accordingly, the Court **DISMISSES** the Cabell County Sheriff's Department as a Defendant without the need for any substitution as the County Commission already is named as a Defendant.[4]

---

[4]The Court is unaware if the Cabell County EMS is a separate suable entity apart from the Cabell County Commission. As the parties have not argued this point, the Court considers EMS as if it is properly named.

**B.**
**42 U.S.C. § 1983**

Next, both the City Defendants and the County Defendants argue that Plaintiffs'

Count I fails to state a federal constitutional claim upon which relief can be granted pursuant to 42

U.S.C. § 1983. In their Complaint, Plaintiffs allege that Defendants did not properly train their

employees on the appropriate way to handle suicidal individuals like Ms. Eagon, and "Defendants'

customs, practices, and policies demonstrated deliberate indifference to the suffering and need of

mentally ill and/or mentally unstable residents of Cabell County." *Compl.* ¶¶36, 38. Plaintiffs also

broadly state Defendants' misconduct violated Plaintiffs' and Ms. Eagon's clearly established

constitutional rights. *Id.* ¶¶39, 41. Although not directly mentioned in the Complaint, Plaintiffs

argue in their briefing that they have plausibly alleged in Count I a claim under *Monell v.*

*Department of Social Services*, 436 U.S. 658 (1978).


As this Court recently explained in *Doe v. Cabell County Board of* Education, Civ.

Act. No. 3:21-0031, 2022 WL 568342 (S.D. W. Va. Feb. 24, 2022), "it is well established [under

*Monell*] that a state's political subdivisions are amenable to suit under § 1983." *Doe*, 2022 WL

568342, at *2.[5] To hold a political subdivision liable under *Monell*, "a plaintiff must 'adequately

plead and prove the existence of an official policy or custom that is fairly attributable to the

municipality and that proximately caused the deprivation of their rights.'" *Id.* (quoting *Semple v.*

*City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999)). In other words, a municipality or local

government unit is liable when an employee acts "under color of some official policy . . . [that]

---

[5]In *Monell*, the Supreme Court found that "Congress . . . intend[ed] municipalities and
other local government units to be included among those persons to whom § 1983 applies." 436
U.S. at 690 (footnote omitted).

causes [the] employee to violate another's constitutional rights." *Monell*, 436 U.S. at 692 (internal

quotation marks omitted). The Fourth Circuit further explained that:

> [a] policy or custom for which a municipality may be held liable
> can arise in four ways: (1) through an express policy, such as a
> written ordinance or regulation; (2) through the decisions of a
> person with final policymaking authority; (3) through an omission,
> such as a failure to properly train officers, that "manifest[s]
> deliberate indifference to the rights of citizens"; or (4) through a
> practice that is so "persistent and widespread" as to constitute a
> "custom or usage with the force of law."

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter v. Morris*, 164 F.3d 215, 218

(4th Cir. 1999)). In evaluating a Complaint, the facts alleged "need not be particularly detailed,

and the chance of success need not be particularly high." *Owens v. Baltimore City State's Att'ys*

*Office*, 767 F.3d 379, 403 (4th Cir. 2014) (citations omitted).


Although Defendants recognize that Plaintiffs' burden under Rule 8 is relatively

light, they nevertheless assert Count I must be dismissed because Plaintiffs have completely failed

to identify any specific federal constitutional violation in their Complaint. Plaintiffs respond in

their briefing that Defendants violated their substantive due process rights under the Fourteenth

Amendment. However, nowhere in the Complaint do Plaintiffs mention substantive due process

or the Fourteenth Amendment. Rather, Plaintiffs only generically allege that Defendants violated

the United States Constitution without ever identifying exactly what constitutional provision they

believe was violated. Although Plaintiffs attempt to rectify the deficiency in their briefing, a

plaintiff is "bound by the allegations contained in [the] complaint and cannot, through the use of

motion briefs, amend the complaint." *Zachair, Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md.

1997), aff'd, 141 F.3d 1162 (4th Cir. 1998) (citations omitted). Therefore, the Court agrees with

Defendants that Plaintiffs' failure to identify in their Complaint any predicate constitutional

violation is fatal to their claim. Thus, the Court **GRANTS** Defendants' motions as to Count I and **DISMISSES** this Count as to all Defendants for failing to state a claim.

## C.
## Tort of Outrage/Reckless
## Infliction of Emotional Distress

In Count IV, Plaintiffs assert a claim for the Tort of Outrage/Reckless Infliction of Emotional Distress. The County Defendants argue this claim must be dismissed against them because they are statutorily immune. In response, Plaintiffs state they are not pursuing this claim against the Cabell County Commission, the Sheriff's Department, or EMS Director Merry. Therefore, the Court **GRANTS** Defendants' motion as to Cabell County Commission and Gordon Merry.[6] The County Defendants further argue Plaintiffs cannot state a plausible claim against Sheriff Zerkle. For the following reasons, the Court disagrees.

In order to prove the Tort of Outrage and Reckless Infliction of Emotional Distress, also sometimes referred to as Intentional Infliction of Emotional Distress (IIED),[7] a plaintiff must prove the following elements:

> (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

---

[6]As previously mentioned, the Sheriff's Department already has been dismissed as the Cabell County Commission is the proper Defendant.

[7]*See Travis v. Alcon Labs., Inc*., 504 S.E.2d 419, 424 (W. Va. 1998) ("Intentional or reckless infliction of emotional distress, also called the 'tort of outrage,' is recognized in West Virginia as a separate cause of action.").

*Hoops v. United Bank*, Civ. Act. No. 3:22-0072, 2022 WL 2400039, at *7 (S.D. W. Va. July 1, 2022) (quoting *Travis*, 504 S.E.2d 419, 425 (W. Va. 1998)). The standard for proving such a claim is very high, and "conduct that is merely annoying, harmful of one's rights or expectations, uncivil, mean-spirited, or negligent does not constitute outrageous conduct." *Courtney v. Courtney*, 413 S.E.2d 418, 423 (W. Va. 1991) (footnote omitted); *Pegg v. Herrnberger*, 845 F.3d 112, 122 (4th Cir. 2017) ("It is difficult to overstate the high burden of proof required to sustain a tort claim for intentional infliction of emotional distress/outrage."). Instead, "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id*. at 423 n.5 (internal quotation marks and citations omitted). "Whether conduct may reasonably be considered outrageous is a legal question, and whether conduct is in fact outrageous is a question for jury determination." *O'Dell v. Stegall*, 703 S.E.2d 561, 594 (W. Va. 2010) (quoting Syl. Pt. 4, *Travis*).

In their motion, the County Defendants argue that Plaintiffs have not stated an IIED claim against Sheriff Zerkle as they have not plausibly alleged he acted intentionally or recklessly as to Ms. Eagon. Certainly, there are no allegations that Sheriff Zerkle or any employee of the Sheriff's Department were at the scene, had any knowledge of Ms. Eagon's situation, or ever had any contact with her. Without any of these connections with Ms. Eagon, the Court agrees with the County Defendants that Plaintiffs have not plausibly alleged Sheriff Zerkle acted with direct "intent" to inflict emotional distress upon Ms. Eagon or her parents. However, for purposes of a motion to dismiss, the Court must assume the truthfulness of Plaintiffs' allegation that Sheriff Zerkle adopted, enforced, and made known to EMS and HPD that his Department had a custom,

practice, or policy of not dispatching deputies to respond to any mental health crises on a Sunday, regardless of how urgent or dire the situation presents. From this vantage, the Court finds this allegation is sufficient to plausibly allege Sheriff Zerkle intentionally acted so recklessly that it was substantially certain that someone like Plaintiffs would suffer emotional distress. Additionally, it is plausible that such custom, practice, or policy could be found to be "atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency[.]" *Hoops*, 2022 WL 2400039, at *7 (internal quotation marks and citation omitted). Therefore, the Court finds Count IV is sufficient as to Sheriff Zerkle and **DENIES** the County Defendants' motion to have this Count dismissed against him.[8]

---

[8]In their discussion of Count IV, the County Defendants focus on immunity for political subdivisions and make no specific immunity argument as to Sheriff Zerkle. *See The Cty. Defs.' Mem. in Supp. of their Mot. to Dismiss*, at 4-6, ECF No. 27. Additionally, the County Defendants argue that Rex and Diane Eagon cannot bring individual actions for IIED under the West Virginia Supreme Court's holding in *Heldreth v. Marrs*, 425 S.E.2d 157 (W. Va. 1992). In Syllabus Point 2 of *Heldreth*, the West Virginia Supreme Court held:

> A plaintiff's right to recover for the negligent infliction of emotional distress, after witnessing a person closely related to the plaintiff suffer critical injury or death as a result of defendant's negligent conduct, is premised upon the traditional negligence test of foreseeability. A plaintiff is required to prove under this test that his or her serious emotional distress was reasonably foreseeable, that the defendant's negligent conduct caused the victim to suffer critical injury or death, and that the plaintiff suffered serious emotional distress as a direct result of witnessing the victim's critical injury or death. In determining whether the serious emotional injury suffered by a plaintiff in a negligent infliction of emotional distress action was reasonably foreseeable to the defendant, the following factors must be evaluated: (1) whether the plaintiff was closely related to the injury victim; (2) whether the plaintiff was located at the scene of the accident and is aware that it is causing injury to the victim; (3) whether the victim is critically injured or killed; and (4) whether the plaintiff suffers *serious* emotional distress.

Syl. Pt. 2, *Heldreth* (emphasis original). The County Defendants argue that, because Rex and Diana Eagon were not present when their daughter committed suicide, they cannot recover for their

In arguing their motion, the County Defendants also assert that EMS, as a political subdivision,[9] is statutorily immune from the Plaintiffs' outrage and reckless infliction of emotional distress claim. The Court agrees. EMS's statutory immunity claim arises under The West Virginia Governmental Tort Claims and Insurance Reform Act (the "Act"), West Virginia Code § 29-12A-1, *et seq.* Although the Court discusses the Act in more detail below in subsection F with regard to Plaintiffs' state constitutional claim, to the extent it is relevant to Count IV against EMS, the Court recognizes that political subdivisions "are granted broad immunity for any acts with respect to both governmental and proprietary functions unless the acts complained of come within the specific liability provisions of W. Va. Code § 29-12A-4(c)." *Braley v. Thompson*, Civ. Act. No. 2:22-CV-00534, 2023 WL 2351881, at *3 (S.D. W. Va. Mar. 3, 2023) (internal quotation marks and citation omitted). "[S]ection 29-12A-4(c) [of] the Act specifically enumerates certain claims of *negligence* for which liability may be imposed, but "claims of *intentional and malicious acts* are included in the general grant of immunity." *Id.* (emphasis added; internal quotation marks and citations omitted). Thus, given this claim is not one of negligence, the Court finds EMS is entitled to immunity and **GRANTS** the motion to dismiss Count IV against it.

---

emotional distress under Syllabus Point 2 of *Heldreth* and, thus, their IIED claim fails. In the alternative, they argue Plaintiffs cannot recover under a theory of negligent infliction of emotional distress (NIED).

In considering these arguments, the Court first notes that Plaintiffs do not have an NIED claim in their Complaint. Second, the County Defendants have not cited a single case in which *Heldreth* has been applied to an IIED claim. In fact, the briefing on this point is woefully lacking by both sides. Under these circumstances, the Court declines to consider at this time what impact, if any, *Heldreth* has on the individual claims of Rex and Diana Eagon.

[9]The phrase "political subdivisions" includes "any public body charged by law with the performance of a government function and whose jurisdiction is coextensive with one or more counties, cities or towns, . . . and other instrumentalities including . . . emergency service organizations[.]" W. Va. Code § 29-12A-3(c), in part.

The City Defendants also move to have this claim dismissed against them. Plaintiffs respond that they are not pursuing this claim against the City of Huntington. Therefore, the Court **GRANTS** the motion as to the City of Huntington and **DISMISSES** Count IV against it. On the other hand, Plaintiffs argue a jury could find that the individual police officers' conduct was outrageous. The Court disagrees.

Considering the allegations in the light most favorable to Plaintiffs, the Complaint provides that Officers J. Smith, D. Anderson, and M. Creameans responded to Ms. Eagon's residence with EMS. While there, EMS personnel informed Ms. Eagon's boyfriend and parents that the Sheriff's Department was supposed to do mental hygiene orders, but the Department would not do them on a Sunday. *Compl.* ¶21. EMS personnel further said there was nothing they or HPD could do because Ms. Eagon was alert. *Id.* ¶22. According to Plaintiffs, EMS and HPD personnel told Ms. Eagon's boyfriend and her parents that the Sheriff's Department was lackluster and on one occasion St. Mary's hospital would not take someone who "was really bad." *Id.* at ¶¶23, 25.[10] Upon review, the Court finds that, even if the allegations against the individual officers are true, that is, the HPD officers advised Plaintiffs the Sheriff's Department was lackluster on these matters and a local hospital refused to treat another individual, these allegations as a matter of law do not rise to the high level of extreme or outrageous conduct necessary to reasonably be considered outrageous. Therefore, the Court finds that this claim must be dismissed against the individually

---

[10]The City Defendants dispute that any of the HPD officers actually said the Sheriff's Office would not handle the situation on a Sunday and they should wait until Monday. They assert the body camera footage shows that the officer who spoke with the parents told them the "best route" or "best bet" was to obtain a mental hygiene order for involuntary commitment. *The City Defs.' Reply to Pls.' Am. Resp.*, at 2, ECF No. 25 (quoting *Body Camera Video Footage*, Ex. 3 to *The City Defs.' Mot. to Dismiss*).

named police officers. Likewise, as there are no additional allegations against Captain Merritt, who is not even alleged to have been at the scene, Count IV cannot survive against him. Accordingly, the Court **GRANTS** the motion as to all the City Defendants and **DISMISSES** Count IV against them.

### D.
### West Virginia Human Rights Act
### and ADA Claims

In Count V, Plaintiffs assert a claim under the West Virginia Human Rights Act (WVHRA), and in Count VI they assert a claim under the Americans with Disability Act (ADA). In relevant part, the WVHRA makes it unlawful for "the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodations to: [r]efuse, withhold from or deny to any individual because of his or her . . . disability, either directly or indirectly, any of the accommodations, advantages, facilities, privileges or services of the place of public accommodations[.]" W. Va. Code § 5-11-9(6)(A). Similarly, Title II of the American with Disabilities Act provides that "[n]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (emphasis added). To assert a claim under the ADA, a plaintiff "must allege that (1) she has a disability, (2) she is otherwise qualified to receive the benefits of a public service, program, or activity, and (3) she was excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of her disability." *Doe*, 2022 WL 568344, at *5 (internal quotation marks and citations omitted).

Plaintiffs argue that Ms. Eagon met this test because she had a disability, she was entitled to benefits of mental hygiene services, and the Sheriff's Department's policy of not responding to mental hygiene calls on Sundays excluded her from participating in or denied her the benefits of mental hygiene services. The County Defendants argue, however, that the process for involuntarily committing someone to receive mental health services is set forth by statute in West Virginia, *see* W. Va. Code § 27-5-1 *et seq.*, and it requires that a petition be filed to start the process. *See* W. Va. Code § 27-5-2(a) (providing, in part, "[a]ny adult person may make an application for involuntary hospitalization for examination of an individual when the person making the application has reason to believe that the individual to be examined . . . is mentally ill and because of . . . her . . . mental illness, the individual is likely to cause serious harm to . . . herself, . . . if allowed to remain at liberty while awaiting an examination and certification by a [professional]"). Once a petition is filed, it is subject to review, often by a mental hygiene commissioner, and a decision is rendered on whether an individual should be involuntarily detained. W. Va. Code § 27-5-2(c)-(h). The Sheriff's role during this process is set forth in West Virginia Code § 27-5-1(d), which provides:

> Upon written order of the circuit court, mental hygiene commissioner, or magistrate in the county where the individual formally accused of being mentally ill . . . is a resident or is found, the sheriff of that county shall take the individual into custody and transport him or her to and from the place of hearing and the mental health facility. The sheriff shall also maintain custody and control of the accused individual during the period of time in which the individual is waiting for the involuntary commitment hearing to be convened and while the hearing is being conducted[.]

W. Va. Code § 27-5-1(d), in part. The County Defendants argue that, because no one ever filed a petition to have Ms. Eagon involuntarily hospitalized, she was never determined to be eligible for mental hygiene services by a court or mental hygiene officer and, therefore, the Sheriff and the

-16-

Sheriff's Department could not have excluded her from receiving a public benefit she was never deemed qualified to receive.

However, the Court finds that the County Defendants have construed Plaintiffs' allegations too narrowly. While it appears true that a petition was not filed, Plaintiffs' allegation is that they were told the Sheriff's Department had a policy of not responding or acting on a Sunday in mental hygiene situations. Plaintiffs assert the policy itself is discriminatory to individuals who are experiencing mental illness. In other words, Plaintiffs claim that, because Ms. Eagon suffered from a mental disability, she qualified for the Sheriff's Department to respond to the scene and provide her the benefits of its law enforcement services. Plaintiffs assert the policy of not responding to such situations on Sundays is discriminatory to those with mental illness because the Sheriff's Department responds to other emergencies on Sundays.

In response, the County Defendants make a cursory argument that, as alleged, the policy applied to everyone experiencing a mental health crisis on a Sunday. Therefore, the County Defendants argue Ms. Eagon was not individually discriminated against based upon her alleged mental disability. The Court finds such an argument without merit. A public entity cannot escape an allegation of discrimination by arguing that its alleged discriminatory policy discriminates against everyone with a particular disability and, thus, a single individual with that disability who is discriminated against does not have a claim.

For purposes of a motion to dismiss, the Court finds Plaintiffs' allegations are sufficient to plausibly allege claims under both the WVHRA and the ADA against the Cabell

County Commission and Sheriff Zerkle and **DENIES** the motion to dismiss Counts V and VI against them. Additionally, as the County Defendants' argument focuses on the role of the Sheriff's Department and as there are no distinct arguments as to why the WVHRA and ADA claims should be dismissed against EMS or EMS Director Gordon Merry III, these claims also remain against these Defendants.

The City Defendants also argue the WVHRA and ADA claims should be dismissed against them. In their motion, the City Defendants argue that, unlike the Sheriff's Department, the City Defendants have no statutory duty in mental health cases and, thus, do not qualify as an "owner, lessee, proprietor, manager, superintendent, agent, or employee of any place of public accommodations" that could have refused, withheld from or denied "to any individual because of . . . her . . . disability, either directly or indirectly, any of the accommodations, advantages, facilities, privileges or services of the place of public accommodations," which the City Defendants equate to public mental hygiene services, programs, and facilities. W. Va. Code § 5-11-9(6)(A). In response, Plaintiffs argue that the City Defendants wrongfully construe the phrase "place of public accommodations" as public entities that provide mental hygiene services, programs, or facilities. However, even if the Court assumes the allegation is more broadly framed as a denial of law enforcement services, HPD, Captain Merritt, and the individual officers had no duty or authority under West Virginia's mental hygiene provisions to exercise their police powers and take Ms. Eagon involuntarily into their custody and/or control or hospitalize her against her will. Ms. Eagon had the right to refuse their assistance and medical care, and the City Defendants cannot be held liable for discrimination for withholding law enforcement services that they did not have the authority to exercise. Moreover, the Court finds the Complaint fails to sufficiently allege

how HPD, Captain Merritt, and the individual officers actually discriminated against Ms. Eagon under either the WVHRA or the ADA. Therefore, the Court finds Plaintiffs have failed to state plausible claims of discrimination against the City Defendants and **GRANTS** their motion to dismiss Counts V and VI.

### E.
### Ordinarily and/or
### Professional Negligence

In Count III, Plaintiffs assert Defendants owed Plaintiffs a duty and negligently breached the standard of care, which proximately caused their injuries. Specifically, Plaintiffs allege that "Defendants"

> breached their duties by, *inter alia*, (a) failing to get a suicidal patient into critical care, (b) failing to consult with others regarding the critical situation involving the patient, (c) failing to adequately or reasonably address the immediate needs of the critical situation, (d) discouraging other first responders from assisting the patient in emergency, critical need, and (e) failing to do a patient care report, (f) failing to properly evaluate the suicidal patient, (g) failing to attempt to have Darien Eagon voluntarily agree to commitment, (h) failing to further facilitate family's application to an on-call emergency mental hygiene commissioner or magistrate for involuntary commitment, (i) failing to provide information about other psychiatric emergency options[,] (j) providing harmful advice and direction to wait until Monday when Darien Eagon was suicidal and in crisis and immediate danger, and (k) providing false information that the only possible option for assistance in the face of this immediate danger and crisis was to wait until Monday, all of which thus denied care and treatment to the decedent, Darien M. Eagon, during this critical time.

*Compl.* ¶47.[11]

---

[11]Although some of these allegations clearly do not apply to some Defendants, Plaintiffs lump them all together without distinction.

In their motion, the County Defendants assert this Count must be dismissed against the Cabell County Commission and the already dismissed Sheriff's Department because they are statutorily immune.[12] Plaintiffs have responded that they are not pursuing this claim against them. Therefore, the Court **GRANTS** the County Defendants' motion as to Cabell County Commission and **DISMISSES** Count III against it. The City Defendants also argue the negligence claim must be dismissed against them because they owed no legal duty to either Ms. Eagon or her parents. The Court agrees.

When, as here, negligence is invoked, it is axiomatic that the alleged tortfeasor must have breached a duty to a plaintiff. *See* Syl. Pt. 3, in part, *Aikens v. Debow*, 541 S.E.2d 576 (W. Va. 2000) (providing "[n]o action for negligence will lie without a duty broke" (internal quotation marks and citations omitted)). In West Virginia, "[a] governmental entity's duty in the context of an alleged failure to provide any, or sufficient, emergency public service to a particular individual is defined at common law by the public duty doctrine." *Miller v. Elkins-Randolph Cty. Emergency Squad Inc.*, No. 14-0929, 2015 WL 3677209, at *2 (W. Va. June 12, 2015) (unpublished) (citing *Randall v. Fairmont City Police Dep't*, 412 S.E.2d 737, 747 (W. Va. 1991); *Parkulo v. W. Va. Bd. of Prob. and Parole*, 483 S.E.2d 507 (1996)). "Under the public duty doctrine, a government entity or officer cannot be held liable for breaching a general, non-discretionary duty owed to the public as a whole." *W. Va. State Police v. Hughes*, 796 S.E.2d 193, 199 (W. Va. 2017). In other words, when "government owes a duty to the public in general, it does not owe a duty to any individual citizen," so "no private liability attaches when a . . . police

---

[12] The County Defendants only argue that the County Commission and the Sheriff's Department are immune as to Count III. *See The Cty. Defs.' Mem. in Supp. of their Mot. to Dismiss*, at 4-8.

department fails to provide adequate protection to an individual." *Id.* (internal quotation marks and citation omitted). The public duty doctrine is not based on immunity but, rather, an absence of a duty in the first instance. *See* Syl. Pt. 14, *W. Va. Reg'l Jail & Corr. Facility Auth. v. A.B.*, 766 S.E.2d 751 (W. Va. 2014) ("The 'special relationship' or 'special duty' doctrine is an exception to the liability defense known as the public duty doctrine; it is neither an immunity concept nor a stand-alone basis of liability.").

However, an exception to the public duty doctrine exists if a "special relationship" is established between the governmental entity or political subdivision and a specific individual beyond what is provided to the general public. *Id.* To determine whether a "special relationship" is created, a plaintiff must show:

> (1) An assumption by the state governmental entity, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the state governmental entity's agents that inaction could lead to harm; (3) some form of direct contact between the state governmental entity's agents and the injured party; and (4) that party's justifiable reliance on the state governmental entity's affirmative undertaking.

*Hughes*, 796 S.E.2d at 199-200 (internal quotation marks and citation omitted). In this case, Plaintiffs argue that a special relationship existed because 911 was called, the EMS personnel and HPD officers responded to the scene, they gave them bad advice, and then they left without helping Ms. Eagon get the critical care she needed. Plaintiffs further assert they relied upon the statements made to them and did not pursue getting immediate help for Ms. Eagon because they believed nothing could be done on a Sunday.

In their motion, the City Defendants argue the claim cannot survive because they had no special duty to protect Ms. Eagon from harming herself. The City Defendants assert there are simply no allegations to support a conclusion that they assumed an affirmative duty they would act on Ms. Eagon's behalf. In fact, the City Defendants maintain Plaintiffs allege the opposite, that is, they refused to take actions on behalf of Ms. Eagon. Although the City Defendants recognize that whether a special duty exists is often a jury question,[13] they insist that the lack of factual support in this case warrants dismissal.

In essence, Plaintiffs' argument is that a special relationship was created because the EMS personnel and HPD officers were aware Ms. Eagon was suicidal, gave bad advice, and refused to take any steps to protect her. However, the Court agrees with Defendants that, even taking the facts in a light most favorable to Plaintiffs, this interaction is insufficient to support through promises or actions the existence of an affirmative duty and establishment of a special relationship.[14] At best, Plaintiffs assert the officers handled the situation improperly, but their

---

[13]*See* Syl. Pt. 11, *Parkulo v. W. Va. Bd. of Prob. & Parole*, 483 S.E.2d 507 (W. Va. 1996) ("In cases arising under W. Va. Code § 29–12–5, the question of whether a special duty arises to protect an individual from a State governmental entity's negligence is ordinarily a question of fact for the trier of the facts.").

[14]In support of their position, Plaintiffs cite *Bowden v. Monroe County Commission*, 800 S.E.2d 252 (W. Va. 2017), and *McCormick v. West Virginia Department of Public Safety*, 503 S.E.2d 502 (W. Va. 1998) (per curiam). The Court finds both of these cases are distinguishable from the present one.

In *Bowden*, the plaintiff's husband was killed by a pack of vicious pit bulls, and she claimed that, prior to the attack, a dog warden had assured her "that the 'county would take care of' the dogs. 800 S.E.2d at 259 (footnote omitted). The dog warden denied making any assurances to the plaintiff. *Id.* On appeal of summary judgment in favor of the County Commission, the West Virginia Supreme Court found there was a disputed issue of fact regarding whether the dog warden affirmatively represented that the county would take care of the dogs. *Id.* at 260.

claim the officers did not adequately protect Ms. Eagon from herself and may have given bad advice does not create a special relationship and exception to the public duty doctrine.[15] Therefore, the Court also **DISMISSES** Plaintiffs' negligence claim in Count III against the City Defendants.

Although the County Defendants curiously do not argue the negligence claim should be dismissed against EMS for these same reasons, they argue Plaintiffs' state constitutional claim against EMS should be dismissed under the public duty doctrine. As discussed in more detail below in subsection F, the Court agrees with the County Defendants that there are no allegations to support a conclusion that EMS had a special relationship with either Ms. Eagon or her parents by assuming of an affirmative duty to act on their behalf. Thus, Plaintiffs' negligence claim against EMS fails for the same reasons set forth with respect to Plaintiffs' state constitutional claim. Therefore, the Court **DISMISSES** Count III against EMS. Likewise, the Court finds there are no allegations to support a special duty existed between EMS Director Merry and Plaintiffs. Accordingly, the Court also **DISMISSES** Count III as to him.

---

In *McCormick*, a social worker was stabbed to death by an inmate from a work release center operated by the Division of Corrections. 503 S.E.2d at 504. In reversing summary judgment in favor of the Division of Corrections and its officials in their official capacities, the West Virginia Supreme Court found there was an issue of fact as to whether these defendants and its officials created a special relationship with the victim by using her services as a counselor and, thereby, assuming an affirmative duty to protect her by cautioning her about her assailant, whom they believed had an inappropriate personal interest in her and might attempt to contact her outside of an institutional setting. *Id.* at 508.

[15]Moreover, the Court notes the officers never took Ms. Eagon into custody and they did not create the danger as Ms. Eagon was suicidal before they arrived.

**F.**
**Violation of Article 3, § 10**
**of the West Virginia Constitution**

In Count II, Plaintiffs allege Defendants violated Plaintiffs' rights under Article 3, § 10 of the West Virginia Constitution. This section provides that "[n]o person shall be deprived of life, liberty, or property without due process of law, and judgment of his peers." W. Va. Const. art. 3, § 10. In their motion, the County Defendants argue this claim must be dismissed because they are statutorily immune under The West Virginia Governmental Tort Claims and Insurance Reform Act.

Initially, Plaintiffs argue the Act does not apply to their state constitutional claim. The applicability of the Act is set forth in West Virginia Code § 29-12A-18. To support their argument, Plaintiffs quote, in part, subsection (e) of this section as providing the Act "does not apply to, and shall not be construed to apply to . . . [c]ivil claims based upon alleged violations of the Constitution . . . ."[16] W. Va. Code § 29-12A-18(e), in part. However, Plaintiffs fail to quote the next part the provision, which provides it does not apply to "[c]ivil claims based upon alleged violations *of the Constitution or statutes of the United States*[.]" W. Va. Code § 29-12A-18(e) (italics added). Plaintiffs argue for policy reasons and ambiguity the Court should read the word "Constitution" as applying to either the state or federal Constitutions. The Court declines to do so and finds the language plain on its face. The word "Constitution" is singular, not plural, and is part of the same prepositional phrase as the word "statutes" beginning with the word "of." As such, the phrase "of the United States" applies to both the word "Constitution" and "statutes." If the West

---

[16] *Pls.' Resp. to Cty. Defs.' Mot. to Dismiss*, at 2, ECF 28.

Virginia legislature had intended this statute to apply equally to the West Virginia Constitution, it clearly could have done so, but it did not, and this Court is not at liberty to read into an unambiguous statute language that simply does not exist. Moreover, this Court previously has recognized that the Act applies to a claim under Article 3, § 10 of the West Virginia Constitution. *See Doe*, 2022 WL 568342, at *4 (stating "the provisions of the [Act] apply in full to the state constitutional claim" raised under Article 3, § 10). Therefore, the Court rejects this argument by Plaintiffs.

In the alternative, Plaintiffs argue that Act does not provide immunity to the County Defendants' actions. The West Virginia Legislature designed the Act "to limit liability of political subdivisions and provide immunity to political subdivisions in certain instances and to regulate the costs and coverage of insurance available to political subdivisions for such liability." W. Va. Code § 29-12A-1.[17] Under the Act, a political subdivision is generally immune from liability "in a civil action for injury, death, or loss to persons . . . allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function[.]" W. Va. Code § 29-12A-4(b)(1), in part. However, West Virginia Code § 29-12A-4(c) provides for certain exceptions to this general rule. As relevant here, a political subdivision is liable for damages when such damages are "caused by the negligent performance of acts by their employees while acting within the scope of employment." W. Va. Code § 29-12A-4(c)(2). Nevertheless, immunity is not lost when "a loss or claim results from . . .

---

[17]In addition to EMS as stated in note 9, *supra*, the phrase "political subdivisions" also includes a county commission and "any public body charged by law with the performance of a government function and whose jurisdiction is coextensive with one or more counties, cities or towns[.]" W. Va. Code § 29-12A-3(c), in part.

the method of providing, police [or] law enforcement . . . protection[.]" W. Va. Code § 29-12A-5(a)(5). As the Cabell County Commission and the Sheriff's Department are political subdivisions under West Virginia Code § 29-12A-3(c), they argue they are entitled to immunity under § 29-12A-4(b)(1) and § 29-12A-5(a)(5).[18] On the other hand, Plaintiffs argue the Cabell County Commission and the Sheriff's Department are not immune because they acted in a wanton and reckless manner.

However, as argued by the County Defendants, the wanton and reckless exception applies to individual employees under West Virginia Code § 29-12A-5(b)(2). This section provides, in part, that "[a]n *employee* of a political subdivision is immune from liability unless . . . [h]is or her acts or omissions were . . . in a wanton or reckless manner." W. Va. Code § 29-12A-5(b)(2), in part (emphasis added).[19] Thus, it does not apply to the Cabell County Commission, the Sheriff's Department, or EMS. However, Sheriff Zerkle is an employee of a political subdivision,[20]

---

[18]In Syllabus Point 8 of *Randall v. Fairmont City Police Dep't*, 412 S.E.2d 737 (W. Va. 1991), the West Virginia Supreme Court explained that § 29-12A-5(a)(5)

> is coextensive with the common-law rule not recognizing a cause of action for the breach of a general duty to provide, or the method of providing, such protection owed to the public as a whole. Lacking a clear expression to the contrary, that statute incorporates the common-law special duty rule and does not immunize a breach of a special duty to provide, or the method of providing, such protection to a particular individual.

Syl. Pt. 8, *Randall*.

[19]In Syllabus Point 6 of *Holsten v. Massey*, 490 S.E.2d 864 (W. Va. 1997), the West Virginia Supreme Court held this provision "is an exception to the public duty doctrine separate and distinct from the common-law special relationship exception to the public duty doctrine."

[20]*See Beckley v. Crabtree*, 428 S.E.2d 317, 319 (W. Va. 1993) (finding the Sheriff is an employee of the County Commission under West Virginia Code § 29–12A–3(a)).

and this exception may apply to him if his acts or omissions were done in a wanton or reckless manner.

In *Holsten v. Massey*, 490 S.E.2d 864 (W. Va. 1997), the West Virginia Supreme Court explained that

> [t]he usual meaning assigned to "willful," "wanton" or "reckless," according to taste as to the word used, is that the actor has *intentionally* done an act of an unreasonable character in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow. It usually is accompanied by a *conscious* indifference to the consequences, amounting almost to willingness that they shall follow; and it has been said that this is indispensable.

*Holsten*, 490 S.E.2d at 877 (emphasis in *Holsten*; internal quotation marks and citations omitted). Utilizing this definition, the Court finds it premature to determine whether the alleged acts and omissions of Sheriff Zerkle in having a policy that the Sheriff's Department would not respond or carry out its duties in mental hygiene cases on Sundays falls within the wanton and reckless exception to immunity. Therefore, the Court **DENIES** the County's motion to dismiss Count II against him. On the other hand, the Court finds this claim as to EMS Director Merry must be dismissed because, unlike Sheriff Zerkle, Plaintiffs have failed to plausibly allege he acted wantonly or recklessly, and the Court finds he is entitled to immunity under § 29-12A-5(b).[21]

---

[21]Section 29-12A-5(b) provides, in full:

> (1) His or her acts or omissions were manifestly outside the scope of employment or official responsibilities;
> (2) His or her acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; or
> (3) Liability is expressly imposed upon the employee by a provision of this code.

W. Va. Code § 29-12A-5(b).

As to the Cabell County Commission and Sheriff's Department, the Court finds the opposite is true. There are no allegations that the Sherriff's Department had any direct contact with either Ms. Eagon or her parents. Thus, the elements necessary to show whether a "special relationship" was created, as explained above in *Hughes*, simply do not exist. Therefore, the Court **DISMISSES** Count II against the Cabell County Commission.

The County Defendants also argue that Plaintiffs have not plausibly alleged a special relationship existed between EMS and Plaintiffs. Similar to the City Defendants' argument as to Plaintiffs' Ordinary and/or Professional Negligence claim, the County Defendants argue the claim against EMS cannot survive because there are simply no allegations to support a conclusion that EMS assumed an affirmative duty it would act on Ms. Eagon's behalf and protect her from herself. The Court agrees. Nothing EMS personnel said or did, as alleged by Plaintiffs, created an assumption of an affirmative duty to act on behalf of Ms. Eagon or her parents. In fact, Plaintiffs allege the EMS personnel told them it could not do anything. *Compl.* ¶22. Thus, the Court finds EMS is entitled to immunity and **GRANTS** the County Defendants' motion as to EMS on Count II.

The City Defendants also argue Count II must be dismissed against them because a special relationship does not exist. For the reasons explained above with regard to Plaintiffs' Ordinary and/or Professional Negligence claim, the Court agrees with Defendants that Plaintiffs' allegations are insufficient to support a theory that the City Defendants created an affirmative duty and established a special relationship with Plaintiffs. Therefore, the Court **GRANTS** the City Defendants' motion to dismiss Count II against them.

**IV.**
**CONCLUSION**

Accordingly, for the foregoing reasons, the Court **ORDERS** the "City of Huntington" be substituted for the Huntington Police Department and both the Huntington Police Department and the Cabell County Sheriff's Department be dismissed from this action as improper parties. The Court also rules as follows:[22]

1) The Court **GRANTS** Defendants' motions as to Count I for a violation of 42 U.S.C. § 1983 and **DISMISSES** this Count as to all Defendants.

2) The Court **GRANTS** the City Defendants' motion as to Count II for violating Article 3, § 10 of the West Virginia Constitution and **DISMISSES** this Count against them. The Court also **GRANTS, IN PART**, the County Defendants' motion as to Count II and **DISMISSES** this claim as to the Cabell County Commission, EMS, and EMS Director Gordon Merry III. The Court **DENIES** the motion as to Sheriff Zerkle.

3) The Court also **GRANTS** the City Defendants' motion and **DISMISSES** Count III as to all the City Defendants. The Court also **GRANTS** the County Defendants' motion as to Count III and **DISMISSES** this claim against the

---

[22]In making its rulings, the Court notes that, although the Complaint does not assert anyone ever contacted Sheriff Zerkle or the Sheriff's Department to respond to Ms. Eagon's situation, the County Defendants do not raise a standing argument as to this fact. Instead, the County Defendants argue Ms. Eagon's parents do not have standing in their individual capacities because they have not suffered any damages. At this point, the Court cannot determine what, if any, damages Ms. Eagon's parents have experienced.

Cabell County Commission, EMS, and EMS Director Gordon Merry III. This claim remains pending against Sheriff Zerkle.[23]

4) The Court **GRANTS** the City Defendants' motion as to Count IV for Intentional Infliction of Emotional Distress and **DISMISSES** all the City Defendants. The Court **GRANTS, IN PART**, the County Defendant's motion as to Count IV and **DISMISSES** the Cabell County Commission, EMS, and EMS Director Gordon Merry III. The Court **DENIES** the County Defendants' motion as to Sheriff Zerkle.

5) The Court **GRANTS** the City Defendants' motion to dismiss Counts V for Disability Discrimination in Violation of the West Virginia Human Rights Act and Count VI for Disability Discrimination under the American with Disabilities Act and **DISMISSES** this claim against all the City Defendants. On the other hand, the Court **DENIES** the County Defendants' motion at to Counts V and VI.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER:          December 21, 2023

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE

---

[23]As previously indicated, Plaintiffs did not move to dismiss this claim against Sheriff Zerkle when it discussed the negligence claim.