IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

**HUNTINGTON DIVISION**

REX EAGON and DIANA EAGON,
individually and as co-administrators of the
ESTATE OF DARIEN M. EAGON,

                Plaintiffs,

v.                                       CIVIL ACTION NO.  3:23-0013

CABELL COUNTY EMERGENCY MEDICAL SERVICES,
UNIDENTIFIED CABELL COUNTY EMERGENCY MEDICAL SERVICES AGENT,
GORDON MERRY III,
CABELL COUNTY COMMISSION,
SHERIFF CHARLES "CHUCK" N. ZERKLE, JR., and
JOHN DOE NON-PARTY FAULT ENTITY IDENTIFIED BY CO-DEFENDANTS,

                Defendants.

**MEMORANDUM OPINION AND ORDER**

       Pending before the Court is a Motion for Summary Judgment filed by Defendants

Cabell County Commission, Cabell County Emergency Medical Services (EMS), Sheriff Charles

Zerkle, and EMS Director Gordon Merry III. ECF No. 98. Also pending is a separate Motion for

Summary Judgment by Defendant EMS on a reinstated negligence claim. ECF No. 108.[1]

Plaintiffs Rex and Diana Eagon, individually and as co-administrators of the Estate of Darien M.

Eagon oppose both motions. For the following reasons, the Court **GRANTS** the joint motion by

Defendants and **GRANTS, in part,** and **DENIES, in part,** the motion by EMS.

---

[1]Defendants misstyle both Memorandum in support of their motions as a "Motion to
Dismiss."

# I.
# FACTS

This action involves the tragic death of Plaintiffs Rex and Diana Eagon's daughter, Darien M. Eagon. On January 10, 2021, Ms. Eagon was drinking alcohol and expressing thoughts of suicide to her live-in boyfriend, Christopher Powers. Concerned for her wellbeing, Mr. Powers called Ms. Eagon's parents. EMS also was called.[2]

Upon arriving at the scene, EMS First Responders Kaylee Hankins and Shawn Marcum went inside the apartment to speak with Ms. Eagon, where they found her lying on a bed. Ms. Hankins and Mr. Marcum stated Ms. Eagon refused to allow them to touch her to check her vital signs. *Shawn Marcum Dep.* 20:11-13, 22-23, ECF No. 98-10; *Kaylee Hankins Dep.* 15:7-12, ECF No. 98-9. There also is no dispute that Ms. Eagon wanted to be left alone, did not want anyone there, and was adamant that everyone leaves. *Rex Eagon Dep.* 88:14-19, 89:3-12, ECF No. 98-8; *Hankins Dep.* 82:19-24; *Marcum Dep.* 20:22-23. [3]

Nevertheless, before leaving, Ms. Hankins and Mr. Marcum asked Ms. Eagon several questions to determine her capacity to refuse treatment. Specifically, Mr. Marcum stated he and Ms. Hankins asked Ms. Eagon if she knew her name, what month it was, where she was,

---

[2]Plaintiffs allege in their Complaint that Mr. Powers called 911, but discovery shows Mrs. Eagon also called 911.

[3]There is conflicting evidence whether Messrs. Eagon and Powers also went inside with EMS. Mr. Eagon stated during his deposition that he and Mr. Powers went inside the apartment with the First Responders. *See Rex Eagon Dep.* 80:12-21, 81:10-13, 82:15-16, 83:4-10. Similarly, Mrs. Eagon said that her husband and Mr. Powers went in the apartment. *Diana Eagon Dep.* 24:12-14; 26:1-12, ECF No. 98-14. However, Ms. Hankins and Mr. Marcum both stated during their depositions that they were the only ones there. *Hankins Dep.* 12:23-24, 13:1-2; *Marcum Dep.* 16:16-22, 17:1-17.

and who the President was. *Marcum Dep.* 18:14-17. He said she was aggravated with them, cursed, and raised her voice every time she got asked a question. *Id.* 78:16-19; 79:2-4. Likewise, Ms. Hankins said they asked her a similar line of questions. *Hankins Dep.* 17:17-21. Both Ms. Hankins and Mr. Marcum indicated Ms. Eagon was able to answer their questions. *Marcum Dep.* 57:21-23; *Hankins Dep.* 19:12-16. Additionally, although Ms. Hankins and Mr. Marcum were informed of Ms. Eagon's earlier suicide attempts, they said Ms. Eagon told them she was not considering suicide at that point. *Hankins Dep.* 18:7-11; 72:21-24, 73:1-2; *Marcus Dep.* 19:19-20; 45:13-16. Despite the fact Ms. Eagon had been drinking, Ms. Hankins and Mr. Marcum determined that, based upon her responses, Ms. Eagon appeared to be alert and oriented and capable of refusing treatment. *Hankins Dep.* 19:15-16; *Marcum Dep.* 56:17-22; 57:10- 13; 21-23.

Mr. Eagon does not dispute that the First Responders asked his daughter questions inside the apartment. *Rex Eagon Dep.* 83:22-24. However, he said that when he asked her "what was going on" she "mumble[d]" and "made no sense." *Rex Eagon Dep.* 83:20-22. He also stated that she told the First Responders she wanted to kill herself. *Id.* 84:2-6. Despite their disagreement about how Ms. Eagon responded, they agree that, after the questioning, Ms. Eagon stayed in the apartment while they went outside to talk. It also is undisputed that the First Responders did not have Ms. Eagon or her anyone else sign a patient refusal/waiver of liability form before they left.

Once outside, they were met by officers with the Huntington Police Department, who had turned on their body cameras and recorded the conversations. In one of the recorded conversations, Ms. Hankins explained to HPD Officer D. Anderson that Ms. Eagon was in the

apartment drinking, but she was "alert and oriented." Ex. 2, Video Recording, 1:27-1:34, ECF

No. 98-2. She further stated Ms. Eagon would not speak with them, did not want to be bothered,

and would not go with them. *Id.* 1:35-40. Additionally, Ms. Hankins told Officer Anderson that

Mr. and Mrs. Eagon and Mr. Powers "are kind of just tired of the self-abuse, and [Mr. Powers]

said he's got videos or evidence of her trying to hurt herself, but, I mean, [EMS] can't do

anything. I was suggesting a mental hygiene, um, kind of where we're at right now." *Id.* 1:41-

1:58. Addressing Messrs. Eagan and Powers, Ms. Hankins explained:

> Mental hygiene basically allows you to get temporary, um, power
> of attorney over her, and it allows you guys to try to force her to
> get help. It's got to be done through the courthouse. Sheriff's
> Department, um, and the Sheriff's Department would actually have
> to come out and serve it, um, and essentially force her to go to the
> hospital, [and] at that point, she doesn't have a choice. They don't
> do that on Sundays. You will have to wait for the courthouse to
> open back up, like tomorrow. Um, to, and then you have to talk to
> somebody about getting a mental hygiene on her. Um, as far as
> long as she's the way, she is upstairs talking to us, like knows her
> name, stuff like that. EMS cannot do anything [. . .][4] Okay. So,
> your only option at this point is a mental hygiene order, and that's
> got to be you.

*Id.* 1:59-2:47. Mr. Eagon interpreted Ms. Hankins's statement that "[t]hey don't do that on

Sundays" as indicating the Sheriff's Office would not serve a mental hygiene order on Sunday.

However, Ms. Hankins clarified during her deposition that she was referring to the ability to

obtain an order because the courthouse is closed on Sundays. *Hankins Dep.* 30:10-16.

Mr. Powers told Officer Anderson and Mr. Eagon that Ms. Eagon had tried to

hang herself about twelve times the night before and a few times that morning and that she had

threatened to falsify a report of domestic abuse against him. Ex. 2, Video Recording at 3:05-16;

---

[4]Mr. Eagon responded "Okay." *Id.* 2:40.

5:00-5:28. Mr. Powers also said he had found her with a cord around her neck sitting on a floor acting like she is unconscious. *Id.* 3:34-39. Officer Anderson asked Mr. Eagon if his daughter was willing to go with him, and Mr. Eagon answered "no." *Id.* 5:32-5:40. Mr. Powers confirmed Ms. Eagon would not go with her parents. *Id.* Throughout the conversation, Officer Anderson told Messrs. Eagon and Powers that neither EMS nor HPD could force Ms. Eagon to be hospitalized if she is alert, oriented, and refuses to go with them. *Id.* 4:13-25; 4:53-5:00; 7:03-7:10. Mr. Eagon asked if Mr. Powers could file a criminal complaint against her, but that option was not pursued after Officer Anderson asked Mr. Powers if it is what he wanted to do. *Id.* 7:10-7:50. Like Ms. Hankins, Officer Anderson repeatedly recommended getting a mental hygiene order. *Id.* 7:54-8:38; 9:18-9:21; 9:37-9:40; 11:27-11:30.

At one point, Officer Anderson walked away from Messrs. Powers and Eagon to speak with the other HPD officers, Ms. Hankins, and Mr. Marcum. *Id.* 8:39. During that conversation, they discussed their inability to do anything under the circumstances, and Officer Anderson mentioned that he had recommended a mental hygiene order. *Id.* 8:42-8:54. Officer Anderson, who apparently was relatively new to the force, then asked how the mental hygiene process worked. *Id.* 8:54-56. Ms. Hankins and another officer at the scene explained an order is obtained through the court system, and Ms. Hankins further said the sheriff's office "is supposed to" follow through with it. *Id.* 8:56-9:13. Afterwards, Officer Anderson went back to where Messrs. Powers and Eagon were standing and told them they were leaving. *Id.* 9:15-9:17. Following all the discussions, Mr. and Mrs. Eagon, the First Responders, and HPD left the scene. Later in the day, Mr. Powers also left the apartment, and Ms. Eagon was left alone. When he

returned, he found Ms. Eagon had committed suicide. Plaintiffs then brought this action against Defendants.

## II.
## STANDARD OF REVIEW

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor[.]" *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

## III.
## DISCUSSION

### A.
### ADA and WVHRA Claims

#### 1.
#### Standing

In Counts V and VI of their Complaint, Plaintiffs allege that: (1) "Darien Eagon suffered from a disability, which played a role in her suicide;" (2) she "was qualified to receive the benefits of public mental hygiene services;" (3) she was treated "differently because of her disability;" and (4) "she was excluded from participation in and denied the benefits of such services or programs on January 10, 2021 on the basis of her disability," in violation of the West Virginia Human Rights Act (WVHRA), West Virginia Code § 5-11-1, *et seq.*, [5] and the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq. Compl.* ¶¶55-58, 60-62. Specifically, Plaintiffs contend that the Cabell County Commission and Sheriff Zerkle maintained a discriminatory custom, practice, or policy that they would not serve mental hygiene orders on Sundays. *Id*. ¶16. With respect to EMS and EMS Director Gordon Merry III, the Complaint is not so direct. Instead, it appears Plaintiffs' argument primarily focuses on their belief that the EMS First Responders mishandled the situation and EMS and Director Merry had a legal duty to ensure emergency medical services are provided to all individuals, including those with disabilities. Regardless, to the extent any of these Defendants discriminated against Ms. Eagon under either the WVHRA or the ADA, Defendants argue the injury belongs to Ms. Eagon's estate, not Mr. and Mrs. Eagon personally.

---

[5]In 2024, the WVHRA was recodified as West Virginia Code § 16B-17-1, *et seq.*

In their Response, Plaintiffs do not address Defendants' argument that Mr. and Mrs. Eagon lack standing in their individual capacities. Instead, Plaintiffs argue that they have standing as the co-administrators of their daughter's estate. As Defendants do not contest the estate has standing, the Court need not address Plaintiffs' argument. On the other hand, the Court agrees with Defendants that Mr. and Mrs. Eagon do not have standing in their individual capacities to bring a WVHRA or ADA claim.

To have standing in their individual capacities, Mr. and Mrs. Eagon must demonstrate: (1) they "suffered an injury in fact that is concrete, particularized, and actual or imminent;" (2) "the injury was likely caused by the defendant;" and (3) "the injury would likely be redressed by judicial relief." *TransUnion v. Ramirez*, 594 U.S. 413, 423 (2021) (citation omitted). In this case, the Court finds that the purported WVHRA and ADA violations are alleged to have been experienced by Ms. Eagon, not her parents. To the extent Ms. Eagon was discriminated against due to an alleged disability, she was a protected person under the Acts and, upon her death, her claims passed to her estate. Plaintiffs do not contend there is any hinderance to the estate litigating these claims. However, Mr. and Mrs. Eagon do not have standing in their individual capacities to pursue them as they are not the ones who experienced the alleged discrimination. Accordingly, the Court **GRANTS** summary judgment in favor of Defendants in this regard and dismisses Mr. and Mrs. Eagon's individual claims under the WVHRA and ADA. *See Cadmus v. Williamson*, Civ. Act. No. 5:15-045, 2017 WL 785659, at *6 (W.D. Va. Feb. 28, 2017) (stating where "the estate is not hindered in pressing the [ADA and Rehabilitation Act] claims of the decedent, the court may not authorize a third party, even a relative, to proceed instead" (citation omitted)).

**2.**
**The ADA and WVHRA Claims**
**on Behalf of the Estate**

Defendants next argue that the ADA and WVHRA claims brought on behalf of the estate fail as a matter of law. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To prove a Title II violation, a plaintiff must show either direct evidence of discrimination or "us[e] the three-step analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Neal v. E. Carolina Univ.*, 53 F.4th 130, 135 (4th Cir. 2022).

In this case, Plaintiffs assert that they can establish a prima facie case of discrimination under the *McDonnell Douglas* framework. To do so, Plaintiffs must demonstrate by a preponderance of the evidence that Ms. Eagon (1) had "a disability"; (2) was "otherwise qualified to receive the benefits of a public program, service, or activity"; and (3) was denied that "service, program, or activity, or otherwise discriminated against, on the basis of their disability." *Nat'l Fed. of the Blind v. Lamone*, 813 F.3d 494, 502–03 (4th Cir. 2016) (citation omitted). If they set forth a prima facie case, "the burden shifts to the defendant[s] to show that [their] decision was made 'for a legitimate, nondiscriminatory reason[.]'" *Neal*, 53 F.4th at 135 (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 252-53 (1981)). If Defendants meet their burden, "then the presumption of discrimination is rebutted and the burden returns to the plaintiff[s] to prove that the [Defendants'] proffered reason was pretext for discrimination." *Id*.

In their motion, Defendants argue Plaintiffs cannot establish a prima facie case because they have not set forth sufficient evidence to meet any of the requirements under the *McDonnell Douglas* framework. Specifically, Defendants argue Plaintiffs have failed to show Ms. Eagon was disabled, she was "otherwise qualified" to receive a "public service, program, or activity," or she was denied a "service, program, or activity" on the basis of her alleged disability. *See Lamone*, 813 F.3d at 502–03; 42 U.S.C. § 12132.[6] Although Defendants insist she fails at every step, summary judgment is appropriate if she faulters on any one step. With this in mind, the Court first considers whether Ms. Eagon had a disability.

The ADA defines a disability as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))." 42 U.S.C. § 12102(1). Under § 12102 of the ADA, this Court must construe the definition of "disability" "in favor of broad coverage of individuals . . . to the maximum extent permitted by the terms of this chapter." 42 U.S.C.A. § 12102(4)(A). However, a liberal application is not without limits.

Plaintiffs argue there is sufficient evidence to put the question of whether Ms. Eagon had a disability to a jury. Specifically, Plaintiffs assert Ms. Eagon was experiencing a short-term mental disability at the time of her death that meets the criteria of subparagraph (A) because it substantially limited a major life activity. In support of their argument, Plaintiffs

---

[6]Section 12132 provides: "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

submitted a letter-form expert report by Dr. Timothy Saar, a licensed forensic psychologist. *Report of Timothy Saar, Ph.D.* (May 30, 2024), ECF No. 101-24. Ms. Eagon was not a patient of Dr. Saar's prior to her death so he conducted a record review to make his conclusions. In his report, Dr. Saar wrote, in part, that "[t]he following information was available to the EMS workers on 01/11/2021 regarding Ms. Eagon. 1. Ms. Eagon had a history of alcoholism . . . 3. Her alcoholism had caused problems at her place of employment." *Id.*, at 1. However, Dr. Saar does not indicate what evidence in the record supports these statements.

Based upon the Court's review, it appears Dr. Saar's statements are derived from a conversation Mr. Eagon had with Officer Anderson at the scene. During that conversation, Mr. Eagon told Officer Anderson that his wife had terminated their daughter's employment many times from a company they owned due to her drinking. However, the videos show that neither Ms. Hankins nor Mr. Marcum were a part of that conversation as they had stepped away to speak with other officers at the scene. Additionally, although Mr. Eagon said he saw 10 or 20 empty Vodka bottles in the apartment,[7] neither Ms. Hankins nor Mr. Marcum recalled seeing empty alcohol bottles in the apartment. *Marcum Dep.* 19:2-4; *Hankins Dep.* 16:12-14, 23:5-8. Even if they had seen them, Ms. Hankins and Mr. Marcum would not have known who drank them or how long the bottles were there.

Significantly, while Dr. Saar said Ms. Eagon had a history of alcoholism, he did not diagnose her with alcoholism. Instead, using the criteria found in the DSM-5-TR (Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, Text Revision), Dr. Saar opined she

---

[7]*Rex Eagon Dep.* 55:5-56:15.

had "Alcohol Intoxication (F10.220)." *Report of Dr. Saar,* at 2. Additionally, other than Dr. Saar's reference to a history of alcoholism, Plaintiffs have not pointed to any evidence in the record in which she was ever diagnosed as an alcoholic or, for that matter, diagnosed with an alcohol problem. It is not disputed that Ms. Eagon was drinking before the First Responders arrived at the scene. However, both Ms. Hankins and Mr. Marcum said she nevertheless was able to answer their questions, was alert and oriented, refused treatment, and made it clear she wanted them to leave.

The Court acknowledges that alcoholism and alcohol dependence can be disabling conditions under the ADA.[8] The Court further recognizes that under 42 U.S.C. § 12102(4)(D) a disability can be "[a]n impairment that is episodic . . . if it would substantially limit a major life activity when active." However, simply being drunk does not qualify as a disability within the meaning of subparagraph (A),[9] and the Court finds the evidence in this case is insufficient to create a genuine issue of material fact as to whether Ms. Eagon's drinking fell within § 12102(4)(D).  *See, e.g., Maull v. Div. of State Police, Dep't of Pub. Safety*, 141 F. Supp. 2d 463, 473 (D. Del. 2001) (stating "the temporary impairments caused by the periodic, and even frequent, overindulgence of alcohol are insufficient to establish a substantially limiting impairment" (citation omitted)).

---

[8]*See Felix v. Sun Microsystems, Inc*., Civ. Act. No. JFM-03-1304, 2004 WL 911303, at *9 (D. Md. Apr. 12, 2004) ("It is undisputed that alcoholism is an impairment under the ADA," but to qualify as a disability it must be "an impairment that substantially limits one or more . . . major life activit[y]").

[9]*See Ogan v. Newport Cafe*, No. Civ., Act. No. 6:23-00452-AA, 2023 WL 7622098, at *3 (D. Or. Nov. 14, 2023) ("being drunk or perceived as drunk is not a disability under the ADA").

At his deposition, Mr. Eagon also stated under oath that his daughter never showed signs of drinking, and there were only two times when he had evidence she consumed alcohol. Once was when she moved out of his house and he found empty Vodka bottles. The second time was the day she died. *Rex Eagon Dep.* 55:20-22; 56:1-7. He further said his daughter "never . . . act[ed] drunk except at her house that day." *Id.* 96:6-11. Mr. Eagon even recalled a business trip they took together with a client and she "refused to have a glass of wine." *Id.* at 56:11-15. He also said he asked two other individuals if she ever acted "like she was drinking on the job," and they replied "no." *Id.* 96:7-11. Given these statements, coupled with the fact there is no evidence Ms. Eagon was ever diagnosed as an alcoholic or with alcohol dependency, the Court finds a reasonable juror could not conclude Ms. Eagon was disabled within the meaning of the ADA.

In his letter-form report, Dr. Saar also opined that Ms. Eagon had an "Unspecified Mental Disorder (F99)" and had "Current Suicidal Behavior (T14.91A)" under the criteria found in the DSM-5-TR. *Report of Dr. Saar*, at 2. Dr. Saar noted that it was reported to officials at the scene that Ms. Eagon had made multiple recent suicide attempts, she recently had ingested alcohol, and she was agitated. Based on the information available to him, he opined that "[i]t was apparent that on 01/20/2021 that Ms. Eagon was, more likely than not, . . . suffering from a mental impairment which impacted her ability to appropriately care for herself." *Id.* at 3.

As explained by the district court in *Fedynich v. Boulder Hous. Partners*, Civ. Act. No. 3:20-165 (DJN), 2020 WL 5371352, at *10 (E.D. Va. Sept. 8, 2020), aff'd, No. 20-2082, 2023 WL 1814208 (4th Cir. Feb. 8, 2023), "[t]o state a claim under [subparagraph (A)], a

plaintiff must identify her disability; otherwise, the Court can only speculate that the plaintiff is actually disabled." 2020 WL 5371352, at *10 (citing *Bakra v. RST Mktg*., 2019 WL 3459251, at *2 (W.D. Va. July 31, 2019) ("'The defendant in a disability discrimination suit does not have fair notice when the plaintiff fails to identify his disability.'" (quoting *Tate v. SCR Medical Transp*., 809 F.3d 343, 345-46 (7th Cir. 2015) (citations omitted))). In other words, "a successful plaintiff will usually allege that he or she suffered from *a specific, recognized* mental or physical illness." *Bresaz v. Cty. of Santa Clara*, 136 F. Supp.3d 1125, 1136 (N.D. Cal. 2015) (italics added).

Here, Dr. Saar states that Ms. Eagon suffered from an "Unspecified Mental Disorder." By its very title, an "unspecified" disorder does not identify any specific disability. In fact, Dr. Saar writes that an "Unspecified Mental Disorder" is a category applying to "symptoms characteristic of a mental disorder . . . but do not meet the full criteria for any mental disorder." *Report of Dr. Saar*, at 2. Likewise, while Dr. Saar opines that "Ms. Eagon was, more likely than not, . . . suffering from a mental impairment which impacted her ability to appropriately care for herself,"[10] he does not specifically identify what that "mental impairment" is. Clearly, a finding of an "unspecified" disorder and nonspecific "mental impairment" does not meet the criteria necessary to be considered a disability under subparagraph (A).

Dr. Saar also states that Ms. Eagon had "Current Suicidal Behavior." Without doubt, there are mental impairments, such as depression, that may qualify as a disability under the ADA and that can result in suicidal thoughts and actions. However, here, Plaintiffs allege

---

[10]*Id.*, at 3.

their daughter "suffered from a disability, which played a role in her suicide"[11] but, as previously stated, they have not identified the underling disability. Simply asserting Ms. Eagon had suicidal behavior as a result of an unspecified mental impairment is not enough. *See Adams v. Vanderbilt Univ.*, Civ. Act. No. 3:23-00001, 2024 WL 1182861, *19 (M.D. Tenn. Mar. 19, 2024) (stating the fact the decedent committed suicide does not qualify as a disability under the ADA where the decedent had an unspecified mental illness, noting in cases finding "suicidal ideation qualifies as something that substantially limits the major life activity of caring for oneself, the plaintiffs alleged (in addition to an adequately defined mental impairment) causation between the specific mental impairment and the suicidal ideation").[12]  Therefore, the Court finds there is insufficient evidence from which a reasonable juror could find Ms. Eagon was disabled within the meaning of subparagraph (A).

Considering next whether Ms. Eagon has a record of impairment that meets the definition of disabled under subparagraph (B) of § 12102(1), the Court finds the evidence is insufficient to create a genuine issue of material fact. In addition to the reasons just discussed, Mr. Eagon said in his deposition that he was unaware of any psychological conditions his daughter had sought treatment for in the past ten years. *Rex Eagon* 58:11-59:1. Similarly, Mrs. Eagon stated in her deposition that she was unaware of her daughter ever being diagnosed with any mental health issues other than being told by a counselor in 1999 that her daughter was a

---

[11] *Compl.* ¶53.

[12] In addition, there does not appear to be any known history of Ms. Eagon having suicidal ideations or attempting suicide. In fact, in her deposition, Mrs. Eagon said she was "stunned" by her daughter's suicide because she never "remember[ed] her saying she is going to kill herself" and she "didn't believe she was going to kill herself." *Diane Eagon Dep.* 18:20-23; 28:8-9.

narcissist. *Diane Eagon Dep.* 29:2-15. Clearly, the evidence is insufficient to show Ms. Eagon "had a record of" a mental impairment for purposes of the ADA.

Finally, turning to whether Ms. Eagon was "regarded as having such an impairment" under subparagraph (C) of § 12102(1), Mr. Marcum said in his deposition he did not see any visible signs of a disability and no one mentioned any disabilities to him. *Marcum Dep.* 68:17-22. Similarly, Ms. Hankins stated in her deposition that no one told her Ms. Eagon was disabled. *Hankins Dep.* 71:14-16. Given this testimony, coupled with the above discussion, the Court finds there is no evidence that either Ms. Hankins or Mr. Marcum regarded Ms. Eagon as disabled. Moreover, pursuant to 42 U.S.C. § 12201(h), "a public entity under subchapter II, and any person who owns . . . or operates a place of public accommodation under subchapter III, need not provide a reasonable accommodation or a reasonable modification to policies, practices, or procedures to an individual who meets the definition of disability in section 12102(1) of this title solely under subparagraph (C) of such section." 42 U.S.C. § 12201(h), in part.[13] Applying this clear language, the Court finds that, even if it assumes Ms. Eagon was "regarded as" having a disability under §12102(1)(C), Defendants were not obligated to provide her a reasonable accommodation. Thus, to the extent Plaintiffs argue Ms. Eagon was "regarded as" disabled, their ADA claim fails.

---

[13]In relevant part, a "public entity" under subchapter II of the ADA is defined as "any State or local government . . . [and] any department, agency, special purpose district, or other instrumentality of a State or States or local government[.]" 42 U.S.C § 12131(1)(A) and (B). Subchapter III of the ADA expressly provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

Additionally, the Court recognizes that EMS was at the scene for the limited purpose of determining what, if any, emergency care Ms. Eagon required. Although they realized Ms. Eagon was drinking and they were told she was suicidal, they found her to be alert and oriented. Ms. Hankins and Mr. Marcum also said she told them she was no longer suicidal and they must leave her residence. Under these circumstances and in this type of setting, the Court finds it is unreasonable to hold EMS personnel to a standard requiring them to determine whether or not she had a disability under the criteria set forth under the ADA and WVHRA. They simply had no reason to believe she was disabled and, as mentioned, Dr. Saar, a licensed forensic psychologist, could not even identify any specific disability Ms. Eagon was experiencing. Thus, the Court finds the standard Plaintiffs attempt to hold EMS to in this regard is too demanding.

Having determined there is insufficient evidence to create a genuine issue of material fact that Ms. Eagon meets the definition of being an individual with a disability under the subparagraphs (A), (B), or (C) of § 12102(1), it is not necessary for the Court to proceed to steps two and three of the *McDonnell Douglas* framework. Accordingly, the Court **GRANTS** summary judgment in favor of Defendants on Plaintiffs' ADA claim. Additionally, as the relevant portion of the WVHRA's definition of disability is identical to the ADA's disability definition,[14] the Court also **GRANTS** summary judgment in favor of Defendants on Plaintiffs' WVHRA claim.

---

[14]West Virginia Code § 16B-17-3(m) defines the term "disability" under the WVHRA as:

> (1) A mental or physical impairment which substantially limits one or more of such person's major life activities. The term "major life activities" includes

-17-

**B.**
**Remaining Claims against Sheriff Zerkle**
**and the Cabell County Commission**

Next, Defendants argue the Court should grants summary judgment in favor of Sheriff Zerkle on the remaining claims against him because he is entitled to immunity under the West Virginia Governmental Tort Claims and Insurance Reform Act (WVGTCA), West Virginia Code §§ 29-12A-1, *et seq.*.[15] Plaintiffs agree that the WVGTCA applies to Sheriff Zerkle. However, they argue he is not entitled to immunity because his acts and omissions were done recklessly, which is an exception to immunity under § 29–12A–5(b)(2).[16] *See* Syl. Pt. 2*, Beckley v. Crabtree*, 428 S.E.2d 317 (W. Va. 1993) ("A sheriff is an employee of a political subdivision, the county commission, and is therefore immune from personal tort liability for acts occurring

---

functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working;

(2) A record of such impairment; or

(3) Being regarded as having such an impairment.

For the purposes of this article, this term does not include persons whose current use of or addiction to alcohol or drugs prevents such persons from performing the duties of the job in question or whose employment, by reason of such current alcohol or drug abuse, would constitute a direct threat to property or the safety of others.

W. Va. Code § 16B-17-3(m).

[15]The claims pending against Sheriff Zerkle include Count II for violating Article 3, §10 of the West Virginia Constitution, Count III for negligence, and Count IV for outrage and reckless infliction of emotional distress.

[16]This exception provides, in relevant part, "[a]n employee of a political subdivision is immune from liability unless . . . [h]is . . . acts or omissions were . . . in a . . . reckless manner[.]" W. Va. Code § 29–12A–5(b)(2), in part.

-18-

within the scope of employment, unless one of the exceptions noted in W. Va. Code § 29–12A–5(b) is applicable."). Upon review, the Court agrees with Defendants.

In support of their claim that Sheriff Zerkle acted recklessly, Plaintiffs assert he "adopted, enforced, and made known to EMS and [the Huntington Police Department] that his Department had a custom, practice, or policy of not dispatching deputies to respond to any mental health crises on a Sunday, regardless of how urgent or dire the situation presents." *Eagon v. Cabell Cty. Emergency Med. Servs*., Civ. Act. No. 3:23-0013, 2023 WL 8853727, at *5 (S.D. W. Va. Dec. 21, 2023). As a result of this common knowledge, Plaintiffs claim Ms. Hankins erroneously told Mr. Eagon there "was nothing that could be done on a Sunday to help their suicidal daughter." *Compl.* ¶16. In denying Defendants' Motions to Dismiss, the Court found Plaintiffs' allegations were "sufficient to plausibly allege Sheriff Zerkle intentionally acted so recklessly that it was substantially certain that someone like Plaintiffs would suffer emotional distress." 2023 WL 8853727, at *5. The Court also determined "it is plausible that such custom, practice, or policy could be found to be 'atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency[.]'" *Id.* (quoting *Hoops v. United Bank*, Civ. Act. No. 3:22-0072, 2022 WL 2400039, at *7 (S.D. W. Va. July 1, 2022)). However, to defeat summary judgment, Plaintiffs must now back up their allegations with sufficient evidence to raise a genuine issue of material fact that Sheriff Zerkle acted recklessly and, if shown, there is a causal connection between those acts and Ms. Eagon's suicide.

In support of their claim, Plaintiffs rely, in part, on Ms. Hankins' statement to Mr. Eagon that he will have to wait until Monday morning to get a mental hygiene order because it

-19-

was Sunday. The Court finds, however, that Plaintiffs have taken Ms. Hankins' statement out of context. First, Plaintiffs do not allege, nor is there any evidence, that they believed Ms. Hankins was speaking on behalf of the Sheriff. Second, in discussing the mental hygiene process, Ms. Hankins specifically told Mr. Eagon he had to get a mental hygiene order "through the courthouse" and then the Sheriff's Department would have to serve it on Ms. Eagon to "force her to go to the hospital." Ex. 2, Video Recording, 2:08-19. Ms. Hankins then said "[t]hey don't do that on Sundays. You will have to wait for the courthouse to open back up, like tomorrow. Um, to, and then you have to talk to somebody about getting a mental hygiene on her." *Id.* at 2:20-31. Although Plaintiffs argue that a reasonable juror could find Ms. Hankins meant both the courthouse and the Sheriff's Department would not take any action on a Sunday by using the phrase "[t]hey don't do that on Sundays," the Court disagrees.

When considered in context, it is clear from Ms. Hankins' very next statement that she was referring to the courthouse being closed on Sundays and not any alleged custom, practice, and policy on the part of the Sheriff's Department failing to serve mental hygiene orders on a Sunday. A fact Ms. Hankins confirmed in her deposition when she said she was talking about the courthouse being closed until Monday morning. *Hankins Dep.* 30:10-16.[17] Additionally, although there was a side discussion between Ms. Hankins and the Huntington police officers in which they alluded to their awareness of issues with the Sheriff's Department serving mental hygiene orders generally, there was no specific mention of the Sheriff's Department not serving orders on Sundays. Instead, consistent with Ms. Hankins' conversation

---

[17]In response to Plaintiffs' counsel's question about what she meant by her statements, Ms. Hankins replied: "At that point, I was talking about the courthouse does not do mental hygienes on Sundays because they are not open." *Id.*

with Mr. Eagon, they discussed the process being initiated at courthouse. Ex. 2, Video Recording at 8:55-9:15.

Plaintiffs further argue that Ms. Hankins' statement is not the only evidence they have that Sheriff Zerkle had a reckless policy, custom, or practice with regard to mental hygiene cases. They also claim there is evidence that:

> (1) as a general matter, the Sheriff's Department was tasked with, overwhelmed by, and generally lackluster in responding to mental hygienes; (2) the Chief Deputy Sheriff told a citizen the Department did not have "the desire" to handle the mental hygiene case for her family member; (3) there is a fact dispute between the County Defendants regarding whether filing a mental hygiene application/petition at Prestera or other medical facility on the weekends and receiving a prompt response from the Sheriff was anything more than a theoretical possibility; (4) the Sheriff acknowledged the 72-hour involuntary commitment option invoked by a staff physician was "very rare" such that the Sheriff knew the mental hygiene process was the vehicle by which the overwhelming majority of people sought help in such situations; (5) the Sheriff knew that in the majority of such cases the Clerk's Office was the only place the public would go to initiate the mental hygiene process; and (6) the Sheriff knew the Clerk's Office was closed on weekends.

*Pls.' Resp. to the Cty. Defs.' Mot. for Sum. J.*, at 20, ECF No. 101. Based upon this evidence, Plaintiffs insist a reasonable juror could conclude that the Sheriff Zerkle had a "policy of relying on in-person filings during business hours at the Clerk's Office to initiate the mental hygiene process," which effectively resulted in a policy of not doing mental hygiene orders on weekends. *Id.* However, even considering this evidence in the light most favorable to Plaintiffs, the Court fails to see how it demonstrates any policy, custom, or practice of Sheriff Zerkle *caused harm to Ms. Eagon*, as she was not subject to a mental hygiene order and the Sheriff's Department had no authority to act.

Pursuant to West Virginia Code § 27-5-2(a), the involuntarily commitment process requires that a petition be filed to start the process. *See* W. Va. Code § 27-5-2(a) (providing, in part, "[a]ny adult person may make an application for involuntary hospitalization for examination of an individual when the person making the application has reason to believe that the individual to be examined . . . is mentally ill and because of . . . her . . . mental illness, the individual is likely to cause serious harm to . . . herself, . . . if allowed to remain at liberty while awaiting an examination and certification by a [professional]"). Once a petition is filed, it is subject to review, often by a mental hygiene commissioner, and a decision is rendered on whether an individual should be involuntarily detained. W. Va. Code § 27-5-2(c)-(h). The Sheriff's role during this process is set forth in West Virginia Code § 27-5-1(d), which provides:

> Upon written order of the circuit court, mental hygiene commissioner, or magistrate in the county where the individual formally accused of being mentally ill . . . is a resident or is found, the sheriff of that county shall take the individual into custody and transport him or her to and from the place of hearing and the mental health facility. The sheriff shall also maintain custody and control of the accused individual during the period of time in which the individual is waiting for the involuntary commitment hearing to be convened and while the hearing is being conducted[.]

W. Va. Code § 27-5-1(d), in part.

While Ms. Hankins gave Mr. Eagon inaccurate information about the mental hygiene process by saying that his only option was to wait until Monday morning to get a mental hygiene order at the courthouse, her comments as an EMS employee in no way created liability on the part of the Sheriff's Department. The Sheriff's Department does not control the hours of operation at the courthouse, is not responsible for issuing mental hygiene orders, was not called to respond to the scene, did not respond to the scene, was not presented with a mental hygiene

order to serve on Ms. Eagon and, in fact, had no knowledge of Ms. Eagon before she tragically committed suicide. As such, there is no causal connection between any alleged reckless policy, custom, or practice of Sheriff Zerkle and Ms. Eagon's suicide as the Sheriff's Department was never asked to serve a mental hygiene order on her (as one was never obtained) or take her into custody. Therefore, irrespective of Sheriff Zerkle's immunity argument, the Court **GRANTS** summary judgment on the remaining claims against him as Plaintiffs have not shown a causal connection between any acts or omissions by him and the injuries alleged in the Complaint.

## C.
## Negligence

By Order entered on October 1, 2024, this Court granted Plaintiffs' Rule 54(b) Motion for Relief from a Portion of the Partial Judgment Order on Defendants' Motion to Dismiss. In its earlier ruling, the Court dismissed Plaintiffs' negligence claim against EMS, finding insufficient allegations to support a conclusion that there was a special relationship between either EMS and Ms. Eagon or EMS and her parents. *Eagon*, 2023 WL 8853727, *11. Based upon new discovery and the fact EMS never actually moved to dismiss the negligence claim, Plaintiffs asked the Court to revise its ruling on this single issue. The Court agreed and reinstated the negligence claim. As the claim was revived, the Court also extended EMS's deadline to file a motion for summary judgment on this issue. Subsequently, the Court requested Plaintiffs to clarify whether they were pursuing both an ordinary negligence claim and a medical malpractice claim. Plaintiffs responded that they are pursing both claims, and Defendants filed a supplemental response that summary judgment is warranted under both theories. With briefing now complete, the Court considers the parties' arguments.

In its motion, EMS argues it is entitled to summary judgment on Plaintiffs' ordinary negligence claim because it owed no special duty to either Ms. Eagon or her parents. In this Court's Memorandum Opinion and Order on Defendants' Motions to Dismiss, the Court addressed the Special Duty doctrine, and it bears repeating here.

When, as here, negligence is invoked, it is axiomatic that the alleged tortfeasor must have breached a duty to a plaintiff. *See* Syl. Pt. 3, in part, *Aikens v. Debow*, 541 S.E.2d 576 (W. Va. 2000) (providing "[n]o action for negligence will lie without a duty broke" (internal quotation marks and citations omitted)). In West Virginia, "[a] governmental entity's duty in the context of an alleged failure to provide any, or sufficient, emergency public service to a particular individual is defined at common law by the public duty doctrine." *Miller v. Elkins-Randolph Cty. Emergency Squad Inc.*, No. 14-0929, 2015 WL 3677209, at *2 (W. Va. June 12, 2015) (unpublished) (citing *Randall v. Fairmont City Police Dep't*, 412 S.E.2d 737, 747 (W. Va. 1991); *Parkulo v. W. Va. Bd. of Prob. and Parole*, 483 S.E.2d 507 (1996)). "Under the public duty doctrine, a government entity or officer cannot be held liable for breaching a general, non-discretionary duty owed to the public as a whole." *W. Va. State Police v. Hughes*, 796 S.E.2d 193, 199 (W. Va. 2017). In other words, when the "government owes a duty to the public in general, it does not owe a duty to any individual citizen," so "no private liability attaches when a . . . police department fails to provide adequate protection to an individual." *Id*. (internal quotation marks and citation omitted). The public duty doctrine is not based on immunity but, rather, an absence of a duty in the first instance. *See* Syl. Pt. 14, *W. Va. Reg'l Jail & Corr. Facility Auth. v. A.B.*, 766 S.E.2d 751 (W. Va. 2014) ("The 'special relationship' or 'special

duty' doctrine is an exception to the liability defense known as the public duty doctrine; it is neither an immunity concept nor a stand-alone basis of liability.").

However, an exception to the public duty doctrine exists if a "special relationship" is established between the governmental entity or political subdivision and a specific individual *beyond what is provided to the general public*. *Id.* To determine whether a "special relationship" is created, a plaintiff must show:

> (1) An assumption by the state governmental entity, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the state governmental entity's agents that inaction could lead to harm; (3) some form of direct contact between the state governmental entity's agents and the injured party; and (4) that party's justifiable reliance on the state governmental entity's affirmative undertaking.

*Hughes*, 796 S.E.2d at 199-200 (internal quotation marks and citation omitted).

Here, Plaintiffs first argue the public duty doctrine does not extend to their negligence claims against EMS as a matter of law because EMS services are provided by both public and private entities. Plaintiffs insist this fact makes them fundamentally different than the public services exclusively furnished by police and fire departments. In support of their argument, Plaintiffs cite *Norg v. City of Seattle*, 522 P.3d 580 (Wash. 2023), in which the Washington Supreme Court held that, as a matter of law, the public duty doctrine did not shield a city from a claim that it breached a common law duty of reasonable care by negligently responding to a 911 call. 522 P.3d at 589. In making its decision, the court relied, in part, upon a specific state statute providing that governmental entities are "liable for damages arising out of

-25-

their tortious conduct . . . to the same extent as if they were a private person or corporation."[18] *Id.* at 586. Given this statute and as ambulance services are provided by both public and private entities and the plaintiffs' claim arose from common law tort principles, not any statutory duty, the court found Washington state law requires that a public ambulance service be held liable to the same extent as its private counterpart. *Id.* at 588.

In this case, however, Plaintiffs have not pointed to any comparable West Virginia statute requiring that a publicly run EMS service be treated the same as a privately run service. Although admittedly there is little case law in West Virginia law discussing the application of the public duty doctrine to publicly run EMS services, the West Virginia Supreme Court did apply the doctrine in *Miller v. Elkins-Randolph County Emergency Squad, Inc.*, No. 14-0929, 2015 WL 3677209 (W. Va. June 12, 2015), an unpublished opinion. In affirming a lower court's decision to grant summary judgment in favor of the defendant, the West Virginia Supreme Court declared that "[a] governmental entity's duty in the context of an alleged failure to provide any, or sufficient, emergency public service to a particular individual is defined at common law by the public duty doctrine." 2015 WL 3677209, at *2 (citations omitted). Considering the facts of the case, the Court further found the plaintiff could not met the special relationship exception test because there was no direct contact between the defendant and the decedent. *Id.* at 3. Thus, it appears that the West Virginia Supreme Court permits the public duty doctrine to be applied to public EMS services.

---

[18] *See* RCW 4.96.010(1) (local governments); RCW 4.92.090 (state government).

Plaintiffs further argue, however, that West Virginia law requires the public duty doctrine to be "coextensive" with the immunity found in West Virginia Code § 29-12A-5(a)(5). *Pls.' Resp. to Defs.' Mot. with Respect to Pls.' Neg. Claim*, at 4 (citing *Holsten v. Massey*, 490 S.E.2d 864, 871 (W. Va. 1997) (stating "the public duty doctrine must be applied in a manner consistent with the provisions of the Governmental Tort Claims and Insurance Reform Act")). This section provides, in relevant part, "[a] political subdivision is immune from liability if a loss or claim results from . . . the method of providing, police, law enforcement or fire protection[.]" W. Va. § 29-12-5(a)(5). As EMS clearly is not included in this statute, Plaintiffs insist the public duty doctrine should not apply to it. However, in *J.H. v. West Virginia Division of Rehabilitation Services*, 680 S.E.2d 392 (W. Va. 2009), the West Virginia Supreme Court rejected a similar argument made by the Division of Rehabilitation Services (DRS). As here, DRS argued the public duty doctrine and its special relationship exception are inapplicable because it does not have a "nondiscretionary statutory duty to provide police, fire, or other public safety protection to an individual[.]" 680 S.E.2d at 403 (internal quotation marks and citation omitted). In its ruling, the West Virginia Supreme Court emphasized the distinction between the public duty doctrine and immunity and determined the issue of whether a special duty arose between DRS and the plaintiff was a jury question. *Id*. at 404. While the West Virginia Supreme Court also recognized the question of "'whether a special duty arises to protect an individual from a State governmental entity's negligence is ordinarily a question of fact for the trier of facts,'"[19] "ordinarily" is not always, as evidenced by its decision in *Miller*, *supra*.

---

[19]*Id.* (quoting Syl. Pt. 11, *Parkulo v. West Virginia Bd. of Probation and Parole*, 483 S.E.2d 507 (W. Va. 1996)).

As to Plaintiffs' general negligence claim in this case, the Court stands by its earlier decision. Taking the evidence in the light most favorable to Plaintiffs, there simply is insufficient evidence to support an argument that a special relationship was established between EMS and Ms. Eagon and/or her parents. EMS arrived on the scene and spoke with Ms. Eagon. Ms. Eagon refused all medical treatment, refused to be transported, and demanded everyone leave. Nevertheless, before they left, Ms. Hankins and Mr. Marcum asked Ms. Eagon several questions, she answered those questions correctly, and she was determined to be alert and oriented. Although Mr. Eagon asserts his daughter said she was suicidal, both Ms. Hankins and Mr. Marcum stated she told them she was not. Once outside, Ms. Hankins explained to Mr. Eagon that it was his responsibility to get a mental hygiene order because EMS had no authority to do anything at that point. In other words, Ms. Hankins expressly disavowed that EMS was undertaking an affirmative duty to act on Ms. Eagon or her parents' behalf. Given these facts, the Court finds that the evidence is insufficient, as a matter of law, to prove the existence of the special relationship exception to the public duty doctrine. Thus, as to Plaintiffs' ordinary negligence claim, the Court **GRANTS** summary judgment in favor of EMS. Additionally, although Ms. Hankins gave Mr. Eagon inaccurate information about when and how he could get a mental hygiene order, there is no evidence it was an intentional misrepresentation. Therefore, to that extent, the Court also **GRANTS** EMS summary judgment as it is entitled to immunity pursuant to West Virginia Code § 29-12A-5(a)(12), which provides "[a] political subdivision is immune from liability if a loss or claim results from . . . [m]isrepresentation, if unintentional." W. Va. Code § 29-12A-5(a)(12).

Turning next to Plaintiffs' claim under West Virginia's Medical Professional Liability Act (MPLA), West Virginia Code § 55-7B-1, *et seq*., the Court reaches a different result. In support of their MPLA claim, Plaintiffs filed a notice of claim pursuant to West Virginia Code § 55-7B-6(b).[20] With the notice, Plaintiffs attached a copy of a Screening Certificate of Merit, executed by Gary Ludwig, as an expert in EMS systems. *Cert. of Merit of Gary Ludwig* (Dec. 14, 2021), ECF No. 114-1. In his letter-form report dated May 23, 2024, Mr. Ludwig reviewed the evidence provided to him and opined to a reasonable degree of certainty that Ms. Hankins and Mr. Marcum deviated from the standard of care by:

- Failing to conduct a proper secondary assessment of the patient.
- Failing to consider Ms. Eagon a patient.
- Failure to Treat Mental Disease and Behavioral Health as Serious as Other Medical and Trauma Emergencies.
- Failure to Contact Medical Command.
- Failure to obtain a patient refusal form.
- Failure to Properly and Continually Train Cabell County EMS Personnel on Managing Behavioral Health and Mental Hygiene Patients.

*Ltr. Report by Gary Ludwig to Pls.' Counsel*, at 12, ECF No. 101-23.

In its Supplemental Response to Plaintiffs' MPLA claim, Defendants argue this claim should be dismissed for many of the same reasons as the general negligence claim. The Court disagrees. Plaintiffs' theory of recovery under the MPLA claim extends beyond the issue of whether a special relationship was created between EMS and Ms. Eagon and/or her parents. Instead, Plaintiffs allege the standard of care was violated because Ms. Hankins and Mr. Marcum

---

[20]This section provides, in part, that "[a]t least 30 days prior to the filing of a medical professional liability action against a health care provider, the claimant shall serve by certified mail, return receipt requested, a notice of claim on each health care provider the claimant will join in litigation." W. Va. Code § 55-7B-6(b), in part.

did not treat her as a patient and as someone experiencing a significant mental health crisis who needed a more thorough assessment to properly evaluate her ability to refuse care. Additionally, they assert EMS failed to train its employees on how to handle this type of situation.

Defendants argue in their Supplemental Response that Ms. Eagon did not meet the MPLA's definition of a patient because she voluntarily refused care. Under the MPLA, a patient is defined as "a natural person who receives or should have received health care from a licensed health care provider under a contract, expressed or implied." W. Va. Code § 55–7B–2(m) (1986). However, the Court finds Defendants' argument overlooks the "should have" aspect of this definition. Plaintiffs' assertion is that, if EMS would have performed a proper assessment, they would have determined Ms. Eagon was experiencing a mental health crisis and she was in desperate need of patient care to prevent her from committing suicide. These allegations raise factual issues that are inappropriate to decide on summary judgment.

Additionally, Defendants insist that, once Ms. Eagon refused care, they had no authority to require her to accept medical help or transport her to a hospital. Therefore, they assert there could be no breach of the standard of care. Yet, Defendants' argument rests on the premise that Ms. Eagon was alert and oriented, and Plaintiffs' point is that the assessment used to make that determination was insufficient. Under Plaintiffs' theory, if a proper assessment was performed, Ms. Hankins and Mr. Marcum would have realized Ms. Eagon was incompetent to refuse care and was at risk of suicide and, with this knowledge, they could have taken additional steps to save Ms. Eagon's life. The Court finds these issues are questions for a jury to decide, not the Court.

Likewise, the Court finds it is a jury issue as to whether Ms. Eagon's suicide was foreseeable. The evidence shows EMS was called to the residence because Ms. Eagon was threatening suicide, they knew she was drinking, and Mr. Powers expressed his concerns about her suicidal behavior. Although Ms. Hankins and Mr. Marcum stated she denied being suicidal to them, taking the evidence in the light in most favorable to Plaintiffs, it is possible that a jury could determine their assessment of her was insufficient and, despite her denial, her suicide was foreseeable. If so, her suicide would not have broken the causal chain of events. Given these factual issues, the Court finds summary judgment is improper and **DENIES** the same with respect to Plaintiffs' MPLA claim.

## IV.
## CONCLUSION

Accordingly, for the foregoing reasons, the Court **DENIES** Defendants' Motion for Summary Judgment as to Plaintiffs' claims against EMS under West Virginia's Medical Professional Liability Act (MPLA), West Virginia Code § 55-7B-1, *et seq*., but **GRANTS** the motion in all other respects.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER:        January 10, 2025

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE